# Order

Michigan Supreme Court
Lansing, Michigan

May 29, 2020

154773

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff-Appellee,

v

IHAB MASALMANI,
      Defendant-Appellant.

_____/

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

SC: 154773
COA: 325662
Macomb CC: 2009-005244-FC

On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of April 5, 2019. The application for leave to appeal the September 22, 2016 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the questions presented should be reviewed by this Court.

MCCORMACK, C.J. (*dissenting*).

I respectfully dissent from the Court's determination that leave to appeal was improvidently granted in this case. The trial court's sentencing decision reveals the critical flaw in this Court's opinion in *People v Skinner*, 502 Mich 89 (2018): by reading the Sixth Amendment out of MCL 769.25 we have permitted life-without-parole sentences that violate the Eighth Amendment. I would overrule *Skinner*. Short of that, I would vacate the decision below and remand to the trial court for resentencing, because the trial court abused its discretion when it treated the mitigating factors as aggravating factors to justify its sentence of life imprisonment without the possibility of parole.

The defendant, Ihab Masalmani, was 17 years old when he and 16-year-old Robert Taylor committed the offense for which Masalmani was sentenced to life without parole (LWOP). The two juveniles abducted a 21-year-old man in the parking lot of a fast-food restaurant and took the victim to a vacant home, where Masalmani shot and killed him.

Masalmani was charged with multiple felonies, including first-degree felony murder.[1] Masalmani was convicted, and the trial court imposed the then statutorily mandated sentence of LWOP for the murder conviction. At Masalmani's original

---

[1] At the time of his crimes, Michigan law treated all 17-year-olds charged with crimes as adults, regardless of their offense. See MCL 712A.1(1)(i), amended effective October 1, 2021, by 2019 PA 109.

sentencing proceeding the trial court did not consider (and, given the date of his conviction and sentencing, could not have considered) whether Masalmani was one of the "the rare juvenile offender[s] whose crime reflects irreparable corruption" such that his LWOP sentence was constitutional under the Eighth Amendment. *Miller v Alabama*, 567 US 460, 479-480 (2012) (quotation marks and citations omitted).

*Miller* was decided while Masalmani's appeal of right was pending. The Court of Appeals affirmed Masalmani's convictions but, in light of *Miller*'s prohibition on mandatory LWOP sentences for juvenile (homicide)[2] offenders, the panel vacated his murder sentence and remanded to the trial court for resentencing. *People v Masalmani*, unpublished per curiam opinion of the Court of Appeals, issued March 19, 2013 (Docket Nos. 301376 through 301378), p 7.

On remand, the trial court resentenced Masalmani pursuant to MCL 769.25,[3] our state's legislative response to *Miller*. The trial court heard expert and lay witness testimony. The former included testimony on adolescent brain development—the same science that the Supreme Court discussed in *Miller* to explain why juvenile offenders' "transient rashness, proclivity for risk, and inability to assess consequences" reduces their culpability and "diminish[es] the penological justifications for imposing the harshest sentences . . . even when they commit terrible crimes." *Miller*, 567 US at 472. The latter included testimony about Masalmani's behavior while incarcerated and his family background and upbringing, including descriptions of the physical and sexual abuse he experienced as a child.

At the conclusion of the hearing, the trial court again sentenced Masalmani to LWOP. Addressing the "*Miller* factors" individually,[4] the trial court concluded that all of

---

[2] See *Graham v Florida*, 560 US 48 (2010) (holding that the Eighth Amendment prohibits the imposition of a LWOP sentence on a juvenile offender for a nonhomicide offense).

[3] Under MCL 769.25, a trial court must conduct a "*Miller* hearing" in any case in which the prosecutor timely moves for a sentence of LWOP for a defendant who, while less than 18 years of age, commits a crime the penalty for which is mandatory LWOP (but for the defendant's youthfulness). At that hearing, the trial court must "consider the factors listed in [*Miller*] . . . and may consider any other criteria relevant to its decision, including the individual's record while incarcerated." MCL 769.25(6). The court must "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." MCL 769.25(7).

[4] As *Miller* explained, a sentencing scheme that mandates LWOP for juvenile offenders violates the Eighth Amendment because such a scheme "mak[es] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence" and "poses too great a risk of disproportionate punishment." *Miller*, 567 US at 479. In so holding,

the factors save one (Masalmani's family and home environment) weighed against a term-of-years sentence and favored life without the possibility of parole. The Court of Appeals affirmed the sentence, finding no error or abuse of discretion in the trial court's sentencing decision. *People v Masalmani*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2016 (Docket No. 325662).

We issued our decision in *Skinner* while Masalmani's application for leave to appeal was pending in this Court. *Skinner* raised a constitutional challenge to the sentencing process set forth in MCL 769.25; specifically, whether this process violates the Sixth Amendment right to have (almost) any fact that increases a defendant's punishment beyond the prescribed statutory maximum submitted to a jury and proven beyond a reasonable doubt. See *Apprendi v New Jersey*, 530 US 466 (2000). I thought the answer was yes. That is, the "most natural reading [of MCL 769.25] requires a trial court to make factual findings beyond those found by the jury before it can impose an LWOP sentence on a juvenile," because the statute requires a statement of aggravated and mitigating circumstances considered by the sentencing court, as well as reasons supporting the court's sentencing decision, before the court may impose life imprisonment without the possibility of parole. *Skinner*, 502 Mich at 152-153 (MCCORMACK, J., dissenting).

But my view did not prevail. This Court avoided the Sixth Amendment issue and held that MCL 769.25 does not require a trial court to make *any* additional findings (beyond the offender's guilt) before sentencing a juvenile offender to LWOP. *Skinner*, 502 Mich at 117-119 (opinion of the Court). That is, there is no judicial fact-finding problem, because there is no fact-finding requirement. The Court reasoned that such a result is consistent with *Miller* (and *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718 (2016)),[5] because those decisions do not impose a presumption against LWOP for juvenile offenders. *Skinner*, 502 Mich at 131. Instead, the statute "merely requires" the trial court to consider the *Miller* factors and explain its decision. *Id*. at 114-117; see

---

*Miller* outlined several mitigating factors unique to juvenile offenders that are given no weight in a mandatory sentencing regime. These "*Miller* factors" include: "chronological age and its hallmark features," including "immaturity, impetuosity, and failure to appreciate risks and consequences"; the juvenile's family and home environment; the circumstances of the offense, including susceptibility to familial and peer pressures; the "incompetencies associated with youth," including an inability to deal with police officers, prosecutors, or defense counsel; and reduced culpability due to age and capacity for change. *Miller*, 567 US at 477-478; see also *Skinner*, 502 Mich at 113 (stating that "[MCL 769.25] requires the court to conduct a hearing to consider the *Miller* factors").

[5] *Montgomery* held that *Miller*'s prohibition on mandatory LWOP for juvenile offenders is a substantive rule that must be applied retroactively to cases in which direct appellate review ended before *Miller* was decided.

MCL 769.25(6) and (7). If this is done, the trial court's sentencing decision will not be disturbed on appeal absent an abuse of discretion. *Skinner*, 502 Mich at 131-137.

I remain unconvinced that this approach taken avoids constitutional infirmity.[6] But my disagreement with the Court's constitutional holdings aside, a trial court's decision to sentence a juvenile offender to LWOP is subject to abuse-of-discretion review. See *Skinner*, 502 Mich at 131-137. In my view the trial court abused its discretion here.

"It is undisputed that all of [the *Miller*] factors are mitigating factors." *Skinner*, 502 Mich at 115, citing *Miller*, 567 US at 489. But the trial court's treatment of these factors shows that the court did not treat them as mitigating. That is, the court did not consider them for what they are—circumstances and features common to juvenile offenders generally, consideration of which would lead to reasons *not* to impose the maximum sentence allowed by our federal constitution. See note 4 of this statement. For example, in weighing Masalmani's "chronological age and its hallmark characteristics," *Miller*, 567 US at 477, the trial court concluded that "this factor *favors* imposing [a] sentence of life without the possibility of parole." (Emphasis added). This was not simply unartful phrasing; that is, the court was not finding the *absence* of a general feature of youth to conclude that Masalmani's crime was not mitigated. Rather, the court explained that had Masalmani been several months older at the time of his crime, he would not have benefited from *Miller*'s prohibition on mandatory LWOP sentencing. The court acknowledged that the scientific evidence presented at the *Miller* hearing "established that the prefrontal cortex continues to develop into one's mid-20s," but proceeded to disregard this evidence because "the Court is not free to take this developmental disconnect into consideration when a criminal defendant is over 18." This was a clear abuse of discretion. *Miller* did not suggest that 18-year-olds are, as a class, equipped with the decision-making faculties that 17-year-olds lack. Nor did *Miller* suggest that a sentencer should disregard the expanding body of scientific knowledge on

---

[6] As I explained, I think the majority's approach "renders meaningless the individualized sentencing required by *Miller* by allowing LWOP effectively to serve as the default sentence as long as the prosecutor files [a] motion [seeking a sentence of LWOP]." *Skinner*, 502 Mich at 148 (MCCORMACK, J., dissenting). A sentencing scheme that does not begin with a presumption against LWOP for juvenile offenders violates the Eighth Amendment, at least under current United States Supreme Court jurisprudence. *Id.* at 150. And reading the statute to require no fact-finding requirement at all before a LWOP sentence may be imposed violates *Miller* and *Montgomery*. See *id.* at 145-148. The Supreme Court may resolve these questions next term. See *Jones v State*, 285 So 3d 626 (Miss Ct App, 2017), cert gtd 250 So 3d 1269 (Miss, 2018), cert dis by unpublished order of the Mississippi Supreme Court, entered November 27, 2018 (Docket No. 2015-CT-00899-SCT), cert gtd ___ US ___; 140 S Ct 1293 (2020).

adolescent brain development merely because an older offender who, although developmentally similar, may be subject to mandatory LWOP sentencing. To the extent *Miller* drew a bright line at the legal age of majority, the Court was not suggesting that the adolescent development period ends at the age of 18. See *Roper v Simmons*, 543 US 551, 574 (2005) ("Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. *The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.*") (emphasis added). The testimony in this case, which the trial court appeared to accept, suggested that 18-year-old offenders too should *not* be sentenced as adults, for the reasons explained in *Miller*. That is, while the law does not require that categorically, the facts might well in most cases. The court's treatment of this factor invoked the scientific evidence for the precise opposite of what it showed. In doing so, the court upended *Miller*'s foundational principle—that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller*, 567 US at 474.[7]

The trial court's treatment of the other *Miller* factors (with the exception of Masalmani's family and home environment, which the court acknowledged was mitigating) did not rehabilitate the court's sentencing decision. The court's evaluation of the "incompetencies associated with youth," *Miller*, 567 US at 477, is short enough to quote in full: "[T]here was no evidence that the incapacities of youth caused defendant to be unable to participate in his defense. Nor is there any evidence that he implicated himself due to youthful incapacities. As such, this factor favors sentencing defendant to [LWOP]." Here again, I believe the trial court treated as aggravating circumstances factors that are exclusively mitigating (or, at most, neutral). *Miller* did not suggest that a juvenile offender is more deserving of LWOP if the offender is better able to participate in their defense; *Miller* discussed this factor in explaining how features of our criminal system may lead to disproportionate outcomes between juveniles and adults. See *Miller*, 567 US at 477-478 (explaining that a juvenile offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for

---

[7] The trial court provided similar reasoning when it resentenced codefendant Taylor. Like Masalmani, Taylor was convicted of first-degree felony murder (in a separate trial), received resentencing relief under *Miller* in his appeal of right, and was resentenced to LWOP. Addressing this factor in Taylor's case, the trial court stated:

> Defendant [Taylor] was a mere 14 months shy of his 18th birthday at the time of his offense, suggesting that this developmental disconnect between his prefrontal cortex and his limbic system was not much more pronounced than that of an 18 year old. In short, while this factor does not weigh as heavily against [Taylor] as it did against [Masalmani], the Court is not convinced that this factor mitigates against a sentence of life without the possibility of parole.

example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys").

Most troublesome is the trial court's treatment of Masalmani's potential for rehabilitation. See *Miller*, 567 US at 478 (stating that mandatory LWOP "disregards the possibility of rehabilitation even when the circumstances most suggest it"). After acknowledging that Masalmani's troubled upbringing was a mitigating consideration, the court cited this same upbringing to conclude that Masalmani's potential for rehabilitation was "minimal." In so finding, the court did *not* assert that Masalmani was "irreparably corrupt," but that his rehabilitation would require the type of professional treatment that "he is very unlikely to receive in prison." In other words, the trial court cited the state's inability to provide Masalmani with rehabilitative treatment—a fact completely out of Masalmani's control—as a justification for his lifelong incarceration. The trial court did not evaluate Masalmani's potential for rehabilitation but rather the state's inability to facilitate such rehabilitation.[8]

The "circumstances of the homicide offense," *Miller*, 567 US at 477, weighed heavily in the trial court's decision to impose LWOP, and there is no doubt that Masalmani's crime was vicious. But the individualized inquiry that *Miller* demands, and the sentencing decision that results from it, will always and only occur where a juvenile stands convicted of a homicide. See *Graham v Florida*, 560 US 48 (2010). Our review of the trial court's work must, therefore, always go beyond the trial court's evaluation of this factor. As the Supreme Court explained in *Miller*, "[t]hat Miller deserved severe punishment for killing [his victim] is beyond question. But once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty." *Id*. at 479.

Concluding there was no abuse of discretion in this case underscores my concern that our decision in *Skinner* allows for LWOP sentences that violate the Eighth Amendment. *Skinner*, 502 Mich at 148 (MCCORMACK, J., dissenting) ("I cannot see how *Miller*'s dictates are satisfied by the hollow formality to which the majority's holding would reduce the hearing mandated by MCL 769.25(6)."). Abuse of discretion is a

---

[8] Or rather, the court's *perception* of the state's inability. The trial court did not identify any evidence in the record to support its suspicion that Masalmani would be "very unlikely" to receive rehabilitative services while incarcerated. And evaluating the potential for rehabilitative services in our prison system in the decades to come—time that Masalmani would remain incarcerated had the court declined to impose LWOP—is, at most, an exercise in educated guesswork.

deferential standard. But even so, the trial court's sentencing decision must be a reasonable and principled outcome based on "case-specific detailed factual circumstances." *Skinner*, 502 Mich at 134 (opinion of the Court) (quotation marks and citations omitted). That did not occur here.

For these reasons, I respectfully dissent.

BERNSTEIN and CAVANAGH, JJ., join the statement of MCCORMACK, C.J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

May 29, 2020



Clerk

t0526